UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SABABU BADILI ROUNTREE, | ) | Case No. 06-CV-1204-IEG (JMA) |
| Petitioner, | ) | **REPORT AND RECOMMENDATION OF** |
| | ) | **UNITED STATES MAGISTRATE JUDGE** |
| v. | ) | **ON PETITION FOR WRIT OF HABEAS** |
| | ) | **CORPUS** |
| JAMES E. TILTON, etc., et al., | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## I.   Introduction

Sababu Badili Rountree ("Petitioner"), a state prisoner proceeding pro se, filed a Petition for Writ of Habeas Corpus (the "Petition") pursuant to 28 U.S.C. § 2254 challenging his San Diego Superior Court conviction in case number SCD 156327 for first degree murder and personal use of a firearm.  (Lodgment No. 1, Clerk's Transcript ("CT"), at 189-190.)  Petitioner contends that trial counsel was constitutionally ineffective and that the trial court abused its discretion by improperly admitting evidence.  (See Petition, Grounds One and Two.)

The Court has considered the Petition, Respondent's Answer, Petitioner's Traverse, and all the supporting documents submitted

by the parties.  Based upon the documents and evidence presented
in this case, and for the reasons set forth below, the Court
recommends that the Petition be **DENIED**.

**II.   Factual Background**

This Court gives deference to state court findings of fact
and presumes them to be correct.  Petitioner may rebut the
presumption of correctness, but only by clear and convincing
evidence.  28 U.S.C. § 2254(e)(1); see also Parke v. Raley, 506
U.S. 20, 35-36 (1992) (holding findings of historical fact,
including inferences properly drawn from such facts, are entitled
to statutory presumption of correctness).  The facts as found by
the state appellate court are as follows:

[¶] In the early morning hours of December 25, 1999,
Travis Huffman, a documented "West Coast Crips" gang
member, was shot and killed in the area of 47th and
Market Streets, which is within the "Neighborhood
Crips" gang territory.

[¶] On the previous afternoon, Rountree, a documented
member of the "Lincoln Park Bloods" gang, was socializ-
ing with his girlfriend's mother and stepfather, Ken-
neth McElroy, and his girlfriend's sister's boyfriend
Alvin Phillips.  That evening, Rountree, McElroy and
Phillips left in Rountree's black Chevrolet to purchase
Heineken beer from a liquor store on the corner of
Euclid and Logan streets.  On their way back, they
passed an American Legion Club located just south of
Market Street in San Diego.  McElroy, who was a member
of the legion, asked Rountree to stop so he could say
hello to friends there.  McElroy entered the club and
Rountree, who was wearing brown pants and a green
shirt, remained outside talking to some people.  At
some point, Phillips heard someone say "cuz" to Roun-
tree and Rountree respond, "You guys will not disre-
spect me."  He watched as a confrontation quickly
started to develop with three or four guys pushing
Rountree and Rountree trying to defend himself.  At
about 11:55 p.m., Phillips called the police on his
cell phone, telling the 911 operator in part that the
people jumping Rountree were "all in blue."  According
to Phillips, blue is the color for the Neighborhood
Crips gang.  After the confrontation ended, Rountree
became upset with Phillips because he did not come to
his assistance.  Phillips left the area on foot.

[¶] Rountree and McElroy returned to McElroy's house, where Rountree's girlfriend observed a tear in the neck of Rountree's sweatshirt and a bump on his head. Rountree indicated to her that he felt victimized. Rountree left the house, telling his girlfriend he was going to his aunt's house.

[¶] Close to 1:00 a.m. the next morning, Tasha Devasher was at the intersection of 47th and Market Street drinking with a friend, Mozell Sherrell, in his car. Devasher, approximately 30 years old at the time, had been a 47th Street Crip gang member since she was a teenager. She was intoxicated as she had been drinking the entire holiday week and weekend, and she had not slept the night before. She had also been using marijuana and cocaine. While Devasher and Sherrell talked, Devasher saw a brown or beige colored car drive by. Devasher exited Sherrell's car and was walking down Market toward 47th Street holding an open beer bottle when she saw a man pacing back and forth past her. Thinking the man looked paranoid or that he might harm her, Devasher stopped and stared. The man said "Hi" and Devasher replied in the same manner.

[¶] At about that time Devasher noticed another man appear across the street getting out of a car. He said, "What's up, Cousin Tasha?" Although she was nearsighted and not wearing her glasses that night, Devasher squinted and recognized the man as Rountree, also known by his nickname "Blackout," whom she had known since they were both young and living in the same apartment complex. She responded, "What's up, Black-out."

[¶] According to Devasher, Rountree ran across the street at an angle away from her towards the other man. She heard Rountree say, "What's up, Cuz?" and then a second later she heard five shots. Devasher started to scream and did not wait to see what happened; she hid and then jumped a fence into some bushes. She then saw the same beige or brown car that she had seen earlier speed by. While Devasher screamed, two of her friends, Dedmon Washington and Ray Purvis, arrived "out the middle of nowhere" and approached the victim.

[¶] At 2:28 a.m., Sherrell called 911 to report the shooting. Minutes later the police arrived at the scene. When police stopped Devasher and asked about the shooting, she denied knowing anything about it because she did not want to become involved. Later Devasher told others, including her mother, that she did not see anything that night.

[¶] The victim, Huffman, was shot twice and died as a result of the shot to his torso. San Diego Police Officer Jose Laguda was one of the police officers who

responded to a radio call about the incident at about
2:30 that morning.  While investigating the area, he
found a black American-made car, its doors unlocked and
hood warm, parked in the lot behind a store across the
street from the crime scene.  Inside the car were two
Heineken beer bottles.  According to Officer Laguda,
the temperature that morning was very cold, in the high
thirties or low forties, but when he touched the car's
hood it was warm to his bare hand.  The car was later
found to be registered to Rountree's aunt, who told
investigating police on the morning of the incident
that she had given it to Rountree four days earlier.

[¶] At about 3:45 p.m., San Diego Police Department
Detective Stephen McDonald arrived to process the crime
scene.  He observed Huffman had numerous gang-related
tattoos on his body.  Next to the black vehicle, Detec-
tive McDonald found a white athletic sock tied in a
knot.  Criminalists later found two particles of gun-
shot residue on the sock's interior surface.  They
could not say how or when the particles were deposited
on the sock.

[¶] At some point after the incident, Devasher checked
herself into a psychiatric hospital in part for alco-
holism and in part for psychiatric care because she was
experiencing depression and hallucinations.  On January
12, 2000, Detective McDonald interviewed her about the
incident.  According to Detective McDonald, Devasher
did not seem to be drugged and appeared to understand
his questions, although she was reluctant to speak with
him.  That day, Devasher described a beige car to
Detective McDonald and reluctantly gave him Rountree's
nickname, "Blackout."  Devasher explained she was
reluctant to identify him because they had been close
and grew up together.  She also told the detective the
shooter wore green.  The next day, Detective McDonald
returned to the hospital and showed Devasher a photo-
graphic lineup.  As he began to read the instructions,
Devasher interrupted him and pointed to Rountree's
photograph as the shooter.

[¶] Detective McDonald later spoke with Phillips about
the December 24, 1999 American Legion Club incident.
Phillips told the detective that three or four Crips
jumped Rountree that evening; he could tell they were
Crips because they used the word "cuz."  The detective
also interviewed Rountree's girlfriend, who told the
detective that when Rountree returned in the early
morning hours of December 25, 1999, he told her he had
just been jumped by some Crips.

(Lodgment No. 8 at 3-7.)

//

4

### III. **Procedural Background**

The San Diego County District Attorney's Office filed a Felony Complaint charging Petitioner with one count of murder and personal use of a handgun in violation of California Penal Code sections 187(a) and 12022.53(d). (CT at 1-2.)  A jury found Petitioner guilty, and he was sentenced to 50 years to life in prison.  (CT at 189-190.)

Petitioner filed a direct appeal challenging his conviction and sentence in the California Court of Appeal, Fourth Appellate District, Division One.  (Lodgment Nos. 3-5.)  While his appeal was pending, he filed a Petition for Writ of Habeas Corpus in the California Court of Appeal.  (Lodgment Nos. 6-7.)  In an unpublished opinion addressing both Petitioner's direct appeal and collateral petition, the California Court of Appeal affirmed Petitioner's conviction and sentence .  (Lodgment No. 8.)  Petitioner then filed a Petition for Review in the California Supreme Court, which was denied without comment.  (Lodgment Nos. 9-10.)

Petitioner filed the instant petition pursuant to 28 U.S.C. § 2254 in this Court on June 7, 2006.  [Doc. No. 1.]  Respondent filed an Answer on November 8, 2006, and Petitioner filed a Traverse on March 5, 2007.  [Doc. Nos. 10 and 16.][1]

---

[1]On January 16, 2007, Petitioner filed a Request for Stay/and to Amend Federal Writ, etc. ("Request for Stay").  [Doc. No. 14.]  On January 25, 2007, it appearing that Petitioner may have misunderstood the Court's routine "Notice Regarding Possible Failure to Exhaust [etc.]" [Doc. No. 2] and/or a statement made in Respondent's Answer, the Court ordered Petitioner either to file a Traverse or file an "Amended Request for Stay and to Amend Federal Petition" not later than March 8, 2007.  [Doc. No. 15.]  Petitioner filed a Traverse on March 5, 2007, and the Court denied as moot Petitioner's Request for Stay on May 1, 2007.  [Doc. No. 17.]

06cv1204

**IV.   Discussion**

   **A. Standard of review**

     Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

>    The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C. § 2254(a) (emphasis added).

     The current Petition is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997).  As amended, 28 U.S.C. § 2254(d) reads:

>    (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was <u>adjudicated on the merits</u> in State court proceedings unless the adjudication of the claim –
>
>    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2) (emphasis added).

     To obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2).  <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 403 (2000).  The Supreme Court interprets § 2254(d)(1) & (2) as follows:

>    Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a

06cv1204

conclusion opposite to that reached by this Court on a
question of law or if the state court decides a case
differently than this Court has on a set of materially
indistinguishable facts.  Under the "unreasonable
application" clause, a federal habeas court may grant
the writ if the state court identifies the correct
governing legal principle from this Court's decisions
but unreasonably applies that principle to the facts of
the prisoner's case.

Williams, 529 U.S. at 412-413; see also Lockyer v. Andrade, 538

U.S. 63, 73-74 (2003).

Where there is no reasoned decision from the state's highest

court, this Court "looks through" to the underlying appellate

court decision.  Ylst v. Nunnemaker, 501 U.S. 797, 801-806

(1991).  If the dispositive state court order does not "furnish a

basis for its reasoning," federal habeas courts must conduct an

independent review of the record to determine whether the state

court's decision is contrary to, or an unreasonable application

of, clearly established Supreme Court law.  See Delgado v. Lewis,

223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by

Lockyer v. Andrade, supra, 538 U.S. at 75-76); accord Himes v.

Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state

court need not cite Supreme Court precedent when resolving claims

presented on direct or collateral review.  Early v. Packer, 537

U.S. 3, 8 (2002).  "[S]o long as neither the reasoning nor the

result of the state-court decision contradicts [Supreme Court

precedent,]" id., the state court decision will not be "contrary

to" clearly established federal law.  Id.

**B.   Ineffective Assistance of Counsel**

Petitioner contends his trial counsel's representation was

constitutionally ineffective in three respects:  (1) counsel

failed to obtain a gunshot residue test that "could have raised a

reasonable doubt that Mr. Rountree was the perpetrator;" (2) counsel failed to obtain an expert in eyewitness identification to testify regarding Ms. Devasher's mental state and the effects of taking/not taking Thorazine; and (3) counsel failed to obtain a weather expert to testify regarding the relationship between the weather conditions and warmth of the hood of the car. (Petition, Ground One.)

Under clearly established U.S. Supreme Court law, to establish ineffective assistance of counsel, Petitioner must show: (1) "counsel's representation fell below an objective standard of reasonableness"; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 688, 690, 692, 694 (1984). The Court must review counsel's performance deferentially. Additionally, a wide measure of deference must be given to counsel's tactical decisions. Indeed, Strickland notes that "counsel's tactical decisions are virtually unchallengeable." Strickland at 690; see also, Furman v. Wood, 190 F.3d 1002, 1007 (9th Cir. 1999). A petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland at 689 (citations omitted).

On these claims, the Supreme Court of California denied Petitioner's Petition for Review without opinion. (Lodgment No. 10.) Thus, this Court must "look through" to the California Court of Appeal's decision underlying that denial as the basis for its analysis. See Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991). With regard to Petitioner's ineffective assistance of

counsel claims, generally, the Court of Appeal stated:

> [¶] Here, Rountree's ineffective assistance claim stems
> from his trial counsel's decision to limit the scope of
> his investigation into what is assertedly potentially
> mitigating evidence.  "[A] defendant can reasonably
> expect that before counsel undertakes to act, or not to
> act, counsel will make a rational and informed decision
> on strategy and tactics founded on adequate investiga-
> tion and preparation."  (CA citation omitted.)  This is
> the same type of claim presented by the defendants in
> [Strickland] and *Wiggins v. Smith* (2003) 539 U.S. 510.
> In those cases, the United States Supreme Court ex-
> plained the deference owed such strategic judgments in
> terms of the adequacy of the investigations supporting
> those judgments: "'[S]trategic choices made after
> thorough investigation of law and facts relevant to
> plausible options are virtually unchallengeable; and
> strategic choices made after less than complete inves-
> tigation are reasonable precisely to the extent that
> reasonable professional judgments support the limita-
> tions or investigation.  In other words, counsel has a
> duty to make reasonable investigations or to make a
> reasonable decision that makes particular investiga-
> tions unnecessary.  In any effectiveness case, a par-
> ticular decision not to investigate must be directly
> assessed for reasonableness in all the circumstances,
> applying a heavy measure of deference to counsel's
> judgments.'"  (*Wiggins v. Smith, supra*, 539 U.S. at pp.
> 521-522, quoting [Strickland] at pp. 690-691 ... .)
>
> [¶] With these principles in mind, we turn to each of
> Rountree's contentions.

(Lodgment No. 8 at 19-20.)

### 1.   **Failure to obtain gunshot residue testing**

Petitioner contends his trial counsel was ineffective in

failing to obtain gunshot residue ("GSR") testing of the victim's

clothing to determine the distance from which he was shot

"[b]ecause that evidence could have raised a reasonable doubt

that [Petitioner] was the perpetrator."  (Petition, Ground One.)

Petitioner's claim relies on the premise that the People's case

against him hinged on a theory that Petitioner shot the victim at

point-blank range.  (Traverse at 8.)  Petitioner contends that

because GSR testing would have revealed no gunshot residue

present on the victim's jacket, in turn leading to the inference
that the victim was shot from some considerable distance,
counsel's failure to request such GSR testing was objectively
unreasonable and resulted in his conviction.

In denying Petitioner's direct appeal and habeas claims, the
California Court of Appeal stated:

> [¶] Rountree contends his trial counsel's failure to
> seek a gunshot residue (GSR) examination of Huffman's
> clothing constitutes ineffective assistance because
> later forensic tests excluded the possibility of a
> point blank gunshot, contradicting the People's theory
> of how Rountree shot Huffman.  In particular, Rountree
> points out the forensics tests established that a
> contact shot in similar fabric showed substantial
> ripping that was not present in Huffman's jacket; that
> a test gunshot made at a distance of one centimeter
> showed fragments of unburnt powder, which were not
> present on Huffman's jacket; and a test gunshot made at
> distances from two inches to 27 and one-half inches
> showed molten debris from particles of GSR, which were
> not present on Huffman's jacket.

> [¶] Rountree has not demonstrated deficient perfor-
> mance.  First, the People's case did not turn on the
> theory that Huffman was shot at point blank range.  In
> closing arguments, the prosecutor pointed out that
> "somebody walked up to [Huffman], said, 'What's up,
> cuz'? and shot him through the heart."  In explaining
> malice aforethought to the jury, the prosecutor also
> stated, "Quite obviously when you raise a gun up to
> somebody's chest and pull the trigger, you're intending
> to kill them."  These comments do not limit the Peo-
> ple's theory to a point blank shooting.  Indeed, eye-
> witness Devasher testified initially that the shooter
> "went to" the victim, said, "What's up, Cuz?" and then
> she heard shots a second later.  She did not see either
> the gun or the flash from the gun.  From her testimony,
> it is clear Devasher did not watch the events closely
> after Rountree crossed the street.[2]  It was on cross

---

[2][Footnote 6 in original:] Devasher testified:  "He [Rountree]
went across [the street].  He didn't stop in front of the victim.  He
went across.  Like when I said he went across, I didn't pay the rest
of that no attention.  All I heard was gunshots after that.  I don't
know if he got shot or the victim got shot until the defendant ran
back across the street.  And I heard gunshots.  That's when I started
hollering and jumped.  I don't know who did what.  All I know is the
guy was on the ground when I started yelling.  That's why I didn't
know if the dude fell immediately or not."

examination that Devasher indicated Rountree walked up
to Huffman, touched Huffman's shoulder with his left
hand and then shot him.  Even that scenario, however,
does not conclusively show that Rountree placed his gun
directly against Huffman's chest and fired.

[¶] Second, Rountree downplays that, in fact, GSR was
found on Huffman's jacket.[3]  The expert testified that
the finding of GSR on the jacket indicated that the
muzzle of Rountree's weapon was between two and five
feet from Huffman when it was fired.  Under the evi-
dence presented by the prosecution, the jury could have
concluded the shooting occurred at a distance of two
feet.  But the People's case did not turn solely on the
presence or absence of gunshot residue on Huffman's
jacket.  There was abundant circumstantial evidence
connecting Rountree to the crime, including the pres-
ence of his car, the warmth of the car's hood when
police arrived, and the existence of a sock found next
to his car containing gunshot residue particles indi-
cating a gun had been stored in it in the same manner
as Rountree had done in the past.

[¶] Further, Rountree's papers demonstrate a reasonable
tactical basis for his trial counsel's decision to
forego GSR testing.  In a declaration submitted in
connection with Rountree's habeas petition, Rountree's
appellate counsel related a conversation he had with
Brahms, who "explained that he had considered obtaining
a GSR test for Mr. Huffman's clothing, but decided
against it [because] [i]f GSR were found on the cloth-
ing, that would not have helped Mr. Rountree's de-
fense."  We cannot, on this record, including the
evidence of the GSR found on Huffman's jacket, view
this as anything other than a reasoned tactical deci-
sion within the judgment of trial counsel.  The pres-
ence of GSR in fact did not help Rountree's defense
because it was plausible that the residue was deposited
at fairly close range (two feet) in a manner consistent

---

[3]The California Court of Appeal noted in the preliminary portion
of its denial of Petitioner's direct appeal and habeas petition:
"Rountree originally filed a petition for writ of habeas corpus with
this appeal.  (*In re Rountree*, D042277.)  We issued an order to show
cause returnable to the superior court on the habeas petition, and
stayed the appeal.  The superior court granted Rountree's request for
expert fees for a gunshot residue expert, held an evidentiary hearing
on the matter and denied Rountree's petition.  (See *Rountree v.
Superior Court* (Apr. 20, 2004, D043973) [nonpub. opn.]  This court
thereafter vacated the stay on the instant appeal.  We have
consolidated Rountree's second habeas petition and request for expert
fees with this appeal.  We take judicial notice of the records from
Rountree's first petition for writ of habeas corpus."  (Evid. Code, §§
452, subd. (d), 459.)  (Lodgment No. 8 p. 2, n.1.)

1    with Devasher's testimony.  On this issue, Rountree has
2    not overcome the strong presumption that his counsel's
     decision was reasonable.

3  (Lodgment No. 8 at 20-22.)

4      No GSR testing of the victim's clothing was produced at

5  Petitioner's trial.  (Lodgment No. 2, Reporter's Transcript,

6  "RT," 820-845.)  The medical examiner testified that he was able

7  to "rul[e] out a tight contact wound," but that was the extent of

8  the analysis introduced on the subject.  (RT at 434.)  In other

9  words, the shooter could have been inches, or feet, away from the

10 victim when he fired the shots.  In a declaration submitted in

11 support of his habeas petition to the California Court of Appeal,

12 Petitioner's appellate counsel stated that Petitioner's trial

13 counsel Ronald Brahms "explained that he had considered obtaining

14 a GSR test for [the victim's] clothing, but decided against it.

15 If GSR were found on the clothing, that would not have helped Mr.

16 Rountree's defense."  (Lodgment 6 at 29.)

17     Trial counsel did not seek GSR testing of the victim's

18 clothing because of the risk that the results might hurt Peti-

19 tioner's defense.  Based on all the circumstances, including that

20 the prosecution's case did not specifically rely on a theory that

21 the victim was shot at point-blank range and that ample circum-

22 stantial evidence connected Petitioner to the shooting, counsel's

23 conscious choice not to obtain a GSR test for the victim's

24 clothing should be given a heavy measure of deference.  "There

25 are countless ways to provide effective assistance in any given

26 case.  Even the best criminal defense attorneys would not defend

27 a particular client in the same way."  Strickland, supra, 466

28 U.S. at 689.  Counsel's decision constituted sound trial strategy

1   and, as such, the Court should not find it objectively unreason-

2   able.  Id. at 688.

3   ### 2.   Expert on eyewitness identification

4   Petitioner contends that trial counsel was constitutionally

5   ineffective by failing to introduce testimony of an expert on

6   witness identification to comment on eyewitness Tasha Devasher's

7   "disabilities." (Petition, Ground One; Traverse at 9-11.)  He

8   contends "had the jury been informed of this the witness' testi-

9   mony would have been viewed differently." (Traverse at 11.)  In

10  denying Petitioner's direct appeal and habeas claims, the Cali-

11  fornia Court of Appeal stated:

12      [¶] Rountree faults his trial counsel for failing to
        obtain an expert to explain to the jury the impact of
13      Devahser's disabilities, including the fact she had not
        taken her Thorazine, on her memory and the accuracy of
14      her perception on the morning of Huffman's murder.

15      [¶] On its face, Rountree's habeas petition reveals a
        reasonable tactical basis for counsel's decision, which
16      we will not second-guess.  In it, Rountree's appellate
        counsel avers that Brahms informed him "he had con-
17      tacted a Los Angeles expert on identification and
        provided him all the information he had about Ms.
18      Devasher.  Because Ms. Devasher knew Mr. Rountree, the
        expert opined that his testimony would be of no value
19      to the defense.  During our telephone conversation, Mr.
        Brahms did not remember the name of the expert."  Whet-
20      her to call certain witnesses is a matter of trial
        tactics unless the decision results from an unreason-
21      able failure to investigate.  [Citations omitted.]  No
        such unreasonable failure appears here.  Brahms did not
22      fail to investigate the possibility of presenting a
        defense on this issue; he consulted an identification
23      expert, presented the evidence relating to Devasher to
        that expert, and concluded such an expert would not
24      assist Rountree in his defense.

25      [¶] Rountree maintains Brahms "should have consulted
        additional experts to see if past acquaintance rendered
26      moot all Ms. Devasher's [sic] disabilities."  We be-
        lieve competent counsel would reasonably believe it
27      pointless to search further in the hope of finding an
        expert who would offer a different conclusion.  (Cita-
28      tion omitted.)  "'Competent representation does not
        demand that counsel seek repetitive examinations of the

defendant until an expert is found who will offer a
supportive opinion.'" (Citation omitted.) While
Brahm's investigation may not have been as extensive as
might have been done, we cannot say his procedures to
further investigate a potential defense did not fall
below minimum standards.

[¶] In any event, Rountree has not met his burden to
show prejudice. "To prove prejudice petitioner 'must
show that there is a reasonable probability that, but
for counsel's unprofessional errors, the result of the
proceeding would have been different. A reasonable
probability is a probability sufficient to undermine
confidence in the outcome.' [Citation.] To determine
whether prejudice has been established, we compare the
actual trial with the hypothetical trial that would
have taken place had counsel competently investigated
and presented the alibi defense. [Citation.] This
requires knowledge of all of the evidence that was
presented at trial, not just the evidence that was
presented at the habeas corpus hearing." [Citation
omitted.]

[¶] Having reviewed the evidence presented at trial, we
are convinced there is no reasonable probability the
jury would have reached a different result had it heard
testimony from Rountree's proposed identification
expert about the possibility that Devasher was halluci-
nating or suffering other debilitating consequences of
either intoxication or mental illness on the morning of
Huffman's murder. On Devasher's cross examination,
counsel had Devasher admit she had taken Thorazine in
the past, but had not taken any that night, or at all
during the month of the shooting. Nor had she taken
her pills for depression. Devahser's state of intoxi-
cation that night, both by alcohol and drugs, as well
as her need for eyeglasses and her history of mental
illness was presented at length to the jury, both on
cross-examination and in closing arguments. Further,
as we have stated, there was other circumstantial
evidence pointing to Rountree as the shooter, namely
the nearby presence of his vehicle and the sock evi-
dence.

(Lodgment No. 8 at 23-25.)

The Court of Appeal correctly found that counsel's decision

not to offer the expert testimony was a sound strategic one and

should not be second-guessed. In addition, Petitioner has not

shown, nor is there any reasonable likelihood that he could show,

that, had such an expert testified, Ms. Devasher's credibility

1  would have been undermined to the point that the jury would have
2  found him not guilty.

3      References to Ms. Devasher's alcohol and drug abuse, in
4  addition to her mental health issues, recurred throughout Peti-
5  tioner's trial – on direct examination, cross-examination, and
6  argument by both counsel.  The prosecutor's first question to Ms.
7  Devasher on direct examination confirmed that she had been
8  convicted of a felony drug offense.  (RT 305.)  Defense counsel
9  Mr. Brahms established with his first question on cross-examina-
10 tion that Ms. Devasher was incarcerated at the time she was
11 testifying after having been convicted of cocaine offenses.
12 (RT 330, 555.)  She testified that she had consumed three to four
13 six-packs of beer on the day of the shooting.  She testified
14 several times that she was intoxicated at the time of the shoot-
15 ing, that she was an alcoholic, and that she had also been
16 "smoking drugs" (marijuana and cocaine) during the day and
17 evening of the shooting.  (RT 307, 309, 338, 340-341, 348, 375,
18 392, 595.)

19     Ms. Devasher testified that, shortly after the shooting, she
20 checked herself into a psychiatric hospital due to drinking,
21 depression, and the fact that she was hearing voices.  (RT 325,
22 337-338, 485-486, 593.)  She testified that she had been a Crips
23 gang member since she was 13 years old (RT 335), that she was not
24 wearing her prescription glasses at the time of the shooting
25 (RT 359), and that at the time of the shooting she was taking
26 high blood pressure medication, Thorazine (which she had ne-
27 glected to take on the evening of the shooting), and medication
28 for depression.  (RT 549-551.)

1    When Officer McDonald came to question Ms. Devasher at the

2  psychiatric hospital, she was taking some "real heavy" medication

3  to combat hallucinations.  (RT 583.)  She was on four types of

4  medication when the officer was interviewing her.  (RT 584.)

5  When Officer McDonald visited Ms. Devasher a second time and

6  showed her a photographic lineup, from which she identified

7  Petitioner, she was on all four of these medications.  (RT 603.)

8  During closing argument, defense counsel Mr. Brahms thoroughly

9  attacked Ms. Devasher's credibility in terms of her ability to

10 perceive events and recount them accurately.  (RT 1192-1200.)  It

11 is virtually inconceivable that an expert's analysis of Ms.

12 Devasher's "disabilities" would have further assisted the de-

13 fense, much less changed the outcome of the trial.

14    After a thorough and independent review of the record, the

15 magistrate judge finds that there is no reasonable probability

16 the jury would have reached a different result had it heard

17 testimony from Petitioner's proposed identification expert.  It

18 is clear both that Petitioner has made no showing that trial

19 counsel was objectively unreasonable for not attempting to

20 introduce such testimony and that he has made no showing that he

21 was prejudiced by any alleged error.  Thus, the Court of Appeal's

22 denial of this claim was not contrary to or an unreasonable

23 application of Strickland, and the claim should be denied.

24         **3.   Expert on weather conditions**

25    Officer Jose Laguda testified at trial that he and his

26 partner were the first police responders to the scene of the

27 shooting.  (RT 621-623.)  While searching the area surrounding

28 the scene, Officer Laguda came upon an older-model black

American-made car parked behind a 98 Cent Store across the street from the scene, and the front hood was warm to the touch.  By searching DMV records for the car's license plate number, it was confirmed that the car belonged to Petitioner's aunt and that she had loaned the car to Petitioner four days prior to the shooting. (RT 629-634, 721-722.)  Petitioner contends that trial counsel was constitutionally ineffective by failing to seek an expert to testify as to the prevailing weather conditions on the night of the shooting and, specifically, to testify as to "how long a car hood would remain warmer than the car door." (Petition, Ground One.)  He contends that, "but for counsel's performance, the outcome of Petitioner's trial would have been different." (Id.)

In denying Petitioner's direct appeal and habeas claims, the California Court of Appeal stated:

> [¶] With regard to Rountree's claim of ineffective assistance for failing to retain a forensic engineering expert, we reach the same conclusion.  The declaration from Rountree's appellate counsel reveals that Brahms had an objectively reasonable basis for decision: "[Brahms] had considered a test to measure how long the car hood would have stayed warm.  However, he did not believe that the conditions of Mr. Rountree's car on that night could be duplicated.  The nature of the operating problem was not known, but he believed the car had been fixed long before [Brahms] received Mr. Rountree's case.  The inability to duplicate exactly the conditions of that night made him conclude the results of any car test would not be admissible."
>
> [¶] As Rountree acknowledges, in order to lay a proper foundation for such experimental evidence the proponent must show in part that the experiment was "conducted under at least substantially similar, although not necessarily absolutely identical, conditions as those of the actual occurrence." [Citation omitted.]  Although Brahms apparently believed conditions had to be duplicated exactly to render any test admissible, his erroneous belief by itself does not render his ultimate decision incompetent.  Given that the mechanical problem with Rountree's car was unknown and the car had been repaired in the interim, competent counsel could have reasonably concluded it was not possible to repli-

1    cate conditions for such an experiment even to a point
     of substantial similarity.  Rountree has not overcome
2    the strong presumption that Brahm's representation on
     this matter fell within an objective standard of rea-
3    sonableness.

4   (Lodgment No. 8 at 25-26.)

5        A fair assessment of attorney performance requires that
         every effort be made to eliminate the distorting ef-
6        fects of hindsight, to reconstruct the circumstances of
         counsel's challenged conduct, and to evaluate the
7        conduct from counsel's perspective at the time.  Be-
         cause of the difficulties inherent in making the evalu-
8        ation, a court must indulge a strong presumption that
         counsel's conduct falls within the wide range of rea-
9        sonable professional assistance; that it, the defendant
         must overcome the presumption that, under the circum-
10       stances, the challenged action "might be considered
         sound trial strategy."  [Citation omitted.]

11

12  Strickland, supra, 466 U.S. at 689.  "[S]trategic choices made

13  after thorough investigation of law and facts relevant to plausi-

14  ble options are virtually unchallengeable ... .  In other words,

15  counsel has a duty to make reasonable investigations or to make a

16  reasonable decision that makes particular investigations unneces-

17  sary."  Id. at 690-691.

18       The Court of Appeal was correct in finding that competent

19  counsel could reasonably have concluded it was not possible to

20  replicate conditions of the weather or the vehicle to a point of

21  substantial similarity, in order to make any testing admissible

22  at trial.  Appellate counsel's declaration, attached to Peti-

23  tioner's Petition for Writ of Habeas Corpus filed in the Court of

24  Appeal, indicates that trial counsel Mr. Brahms considered a test

25  to measure how long the car hood would have stayed warm.  (Lodg-

26  ment No. 6 at 29-30.)  Because "he did not believe that the

27  conditions of Mr. Rountree's car on that night could be dupli-

28  cated," and because an unknown repair had been made to the car

18

between the time of the shooting and the time Mr. Brahms received

Petitioner's case, counsel concluded that "the results of any car

test would not be admissible." (<u>Id</u>. at 30.)  Evaluating coun-

sel's conduct from his perspective at the time, as required by

<u>Strickland</u>, it is clear that counsel's decision was reasonable

and constituted sound trial strategy in light of all the circum-

stances.

 After an independent review of the record, the magistrate

judge finds that Petitioner has made no showing that trial

counsel was objectively unreasonable in failing to "conduct an

experiment on the cooling of a car hood." (Traverse at 2.)  On

all counts, the record supports a finding that Mr. Brahms was

fully engaged in defending Petitioner and that he employed sound

trial strategy in doing so.  Thus, the Court of Appeal's denial

of this claim was not contrary to or an unreasonable application

of <u>Strickland</u>, and the claim should be denied.

 **C.   <u>Admission of Evidence at Trial</u>**

 Petitioner contends that the trial court abused its discre-

tion in admitting evidence of: (1) a knotted sock containing

gunshot residue found next to the driver's side door of his car

and (2) a prior conviction for possession of a handgun, which was

found two years earlier in a sock beneath the driver's seat of

his car.  (Petition at Ground Two.)  Petitioner contends that

"nothing could connect the sock [found at the shooting scene] to

the Petitioner but his arrest two years prior," and that link was

wholly insufficient to support admission of either piece of

evidence.  (<u>Id</u>.)

 In denying Petitioner's direct appeal and habeas claims, the

California Court of Appeal stated:

> [¶] At trial, the court allowed the People to introduce
> evidence that at approximately 4:00 a.m. on July 17,
> 1997, a San Diego police officer stopped Rountree for a
> routine traffic violation and found a handgun beneath
> the driver's seat of Rountree's car partially hidden in
> a white sock.  It also allowed the People to present
> evidence of the sock containing particles of gunshot
> residue found on the ground next to the driver's side
> door of Rountree's vehicle near the crime scene.  The
> trial court found the presence of the white athletic
> sock a block and a half away from the crime scene, on
> the morning of Huffman's murder next to the driver's
> door of Rountree's car, relevant to the issue of "whe-
> ther or not there was a gun present in that parking
> lot."[4]
> [¶] Rountree contends the trial court prejudicially
> erred in admitting these items of evidence.  He main-
> tains the prior crime — Rountree's 1997 possession of a
> handgun — was not sufficiently similar to the charged
> offense of murder as to prove identity.  He also chal-
> lenges admission of the parking lot sock found next to
> Rountree's vehicle as "contrary to the evidence before
> the court and contrary to common sense."  Specifically,
> he argues the court's ruling was not supported by
> evidence that use of a sock is an extremely unusual
> method of carrying or concealing a weapon, and was

---

[4][Footnote 2 in original:] The court reasoned; "And there was
something else in the gun – in the sock, and that was gunshot residue,
which would indicate that if the sock didn't contain a foot, that it
did at some point contain a gun.  The car was parked in a shopping
center where there was a Laundromat, but it wasn't parked adjacent to
the Laundromat.  It wasn't at a time when people would ordinarily be
using the Laundromat, that being Christmas Eve or the early morning
hours of Christmas day.  [¶] It's right next to the driver's door.
And the one thing we know from two years ago was that the last time
the defendant was contacted, he had under his seat a gun in a sock.
It's an extremely unusual way to carry a gun.  I have to agree with
counsel I haven't seen anybody else carrying a gun in an athletic
sock.  And if you think about it, it's relevant because the sock is on
the ground.  Things don't come out from under a seat unless somebody
takes them out.  Something has to happen.  They just don't fall out by
gravity.  It's not fast; it's on the seat and then falls out.  That
sock, if it was taken out from under the seat, probably contained the
gun when it was – the gun was taken out of the sock.  The sock then
falls by the wayside.  [¶] It's at the time of the murder, not far
from the location of the murder.  The murder was by a firearm.  It's
extremely probative.  And at this point, weighing this evidence and
the nature in which – the way in which it would come in, that is,
evidence that the defendant was contacted two year earlier, how did he
carry his gun?  In a sock.  Where was the sock?  Under the car seat.
That is not unduly prejudicial to the defense.  So that's where we
are.  It's admissible."  [RT 508-509.]

1   contradicted by evidence that the sock found was tied
    in a knot at one end, negating the court's hypothesis
2   that the perpetrator withdrew the gun from the sock
    before committing the crime.
3
4   [¶] We need not decide whether the trial court abused
    its discretion in these evidentiary rulings, for even
    if we assume the court erred, Rountree has not carried
5   his burden to show resulting prejudice.  In particular,
    we agree there is substantial direct and circumstantial
6   evidence from which the jury could conclude Rountree
    was the perpetrator of Huffman's murder apart from
7   evidence of the parking lot sock and Rountree's 1997
    handgun possession.  Devasher, who was an eyewitness to
8   Huffman's murder, identified Rountree as the shooter in
    both a pretrial photographic lineup and at trial.  Her
9   testimony alone is substantial evidence to uphold
    Rountree's conviction.  [Citation omitted.]  While
10  Rountree questions Devasher's credibility given her
    drug and alcohol use as well as her changing stories to
11  police, the jury obviously believed her testimony
    regarding the events and whom she saw on the night of
12  Huffman's murder.  It is not our province to reassess
    witness credibility on appeal.  [Citation omitted.]
13  Minutes after Huffman's murder, Rountree's vehicle was
    found a block and a half away from the crime scene with
14  its car hood still warm on a cold night.  A gang expert
    explained why Rountree, a documented Lincoln Pak Blood
15  gang member, would have been motivated to retaliate
    with lethal force against a perceived Crip gang member
16  in the same location where he had been involved in a
    fight with other Crip gang members approximately two
17  and a half hours earlier.[]  Finally the People pre-
    sented evidence of Rountree's videotaped interview with
18  detectives two days after the shooting, in which Roun-
    tree failed to tell detectives about the incident at
19  the American Legion club, denied knowing Devasher, and
    claimed his car broke down sometime before midnight.
20
21  [¶] The direct and circumstantial evidence summarized
    above is amply sufficient for the jury to question
22  Rountree's credibility and find Rountree was the perpe-
    trator.  [Citation omitted.]  We therefore conclude
23  there is no reasonable probability the outcome of the
    trial would have been different if the trial court had
    excluded the challenged evidence.  [Citation omitted.]
24

25  (Lodgment No. 8 at 7-10.)

26      Generally, matters relating to a state court's interpreta-

27  tion of state law do not implicate federal constitutional issues.

28  In fact, this Court defers to and is bound by a state court's

06cv1204

interpretation of its own laws.  <u>Wainwright v. Goode</u>, 464 U.S. 78, 84 (1983); <u>Estelle v. McGuire</u>, <u>supra</u>, 502 U.S. at 67-68. Petitioner has provided no authority to indicate that this case does not fall within that general rule.  Moreover, "[a] federal court may not issue the writ [of habeas corpus] on the basis of a perceived error of state law."  <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984).

The admissibility of the sock found next to Petitioner's car at the scene of the shooting and his prior conviction for posses- sion of a sock-wrapped gun was hotly contested at Petitioner's trial.  The prosecution submitted to the trial court a ten-page brief "Regarding Admissibility of Prior Bad Acts Pursuant to [California] Evidence Code Section 1101(B)."  (CT 1-11.)  The trial court heard extensive argument from counsel on the subject and rendered its ruling that the evidence was admissible under California law only after extensive reflection.  (<u>See</u> RT 44-52, 93-110, 167-179, 413-424, 506-509.)  This Court will not second- guess the trial court's reasoned decision under state law.

Petitioner's claim deals solely with the interpretation and application of California law, a matter which does not implicate federal constitutional concerns.  Moreover, even if Petitioner had raised a claim for which federal habeas relief was available, Petitioner's claim is meritless.  The California Court of Ap- peal's decision amply indicates that, irrespective of whether the trial court erred in admitting the evidence, no prejudice re- sulted to Petitioner since there was substantial direct and circumstantial evidence (other than the parking lot sock and the handgun possession) that Petitioner committed the shooting.

Accordingly, Petitioner has not shown that the Court of Appeal's decision was contrary to clearly established U.S. Supreme Court law or the result of an unreasonable determination of the facts in light of the evidence, and the claim should be denied.

**V.    Recommendation**

After a thorough review of the record in this matter, the undersigned magistrate judge finds that Petitioner has not shown that he is entitled to federal habeas relief under the applicable legal standards.   Therefore, the undersigned magistrate judge hereby recommends that the Petition be **DENIED WITH PREJUDICE** and that judgment be entered accordingly.

This Report and Recommendation is submitted to the Honorable Irma E. Gonzalez, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that not later than **September 28, 2007**, any party may file written objections with the Court and serve a copy on all parties.   The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be served and filed not later than **October 15, 2007**.   The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.   See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED:  August 23, 2007

Jan M. Adler
U.S. Magistrate Judge

06cv1204